# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 23, 2009          Decided July 7, 2009

No. 08-1259

JOSEPH STILWELL, ET AL.,
PETITIONERS

v.

OFFICE OF THRIFT SUPERVISION,
RESPONDENT

———

On Petition for Review of an Order
of the Office of Thrift Supervision

———

*Paul M. Smith* argued the cause and filed the briefs for petitioners.

*Christopher A. Sterbenz*, Trial Attorney, U.S. Department of the Treasury, argued the cause for respondent. With him on the brief were *Dirk S. Roberts*, Deputy Chief Counsel, and *Elizabeth R. Helke*, Special Counsel.

*Gregory Taylor* was on the brief for *amicus curiae* American Bankers Association in support of respondent.

Before: GINSBURG, HENDERSON, and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH.

KAVANAUGH, *Circuit Judge*: A new Office of Thrift Supervision regulation allows subsidiaries of mutual holding companies to limit their minority shareholders to 10% of the subsidiary's total minority stock. The idea is to prevent activist minority investors from taking advantage of voting rules that require a majority of the minority shareholders to approve management stock benefit plans. OTS was concerned that large minority stockholders would leverage their voting power so as to unduly interfere in certain areas of corporate governance – for example, by pressuring the institution to engage in stock repurchases or sale of the institution. The rule is thus akin to an anti-takeover device.

Joseph Stilwell is a private investor who has previously acquired more than 10% of minority stock in some subsidiaries of mutual holding companies – and who wants to do so again. He challenges the new OTS rule as arbitrary and capricious under the Administrative Procedure Act. Applying the deferential arbitrary and capricious test, we conclude that the OTS rule is reasonable and reasonably explained. OTS struck a permissible balance between the goals of deterring management's self-dealing and preventing abusive short-term investment strategies. We find no legal basis to upset that policy choice, and we therefore must deny the petition.

I

The Home Owners' Loan Act of 1933 authorizes the Federal Government to issue charters to mutual savings associations. 12 U.S.C. § 1464(a). Under the federal charter, those associations are owned and governed by their members,

who have the right to vote on "all questions requiring action by the members" and the right to receive an "equal distribution of assets, *pro rata* to the value of their accounts" in the event the association is liquidated, dissolved, or wound up. 12 C.F.R. § 544.1. This ownership structure differs from that of a stock bank, shares of which are bought and sold by members of the public at large.

One drawback to the mutual association structure is its inability to raise capital by offering ownership stakes to the public in the form of stock. Federal law does, however, permit mutual savings associations to raise outside capital if they first convert themselves to a mutual holding company (MHC) structure. *See* 12 U.S.C. § 1467a(o); 12 C.F.R. Pt. 575. Two new entities emerge from such a conversion – an MHC owned entirely by the mutual association's original set of member-owners, and a subsidiary company in stock form owned by the MHC. In some cases, the MHC structure may also include the creation of a "mid-tier" holding company controlled by the MHC and owning all of the stock of the reorganizing mutual association. *See* 12 C.F.R. §§ 575.2(q), 575.14(a).

To raise capital, the MHC may sell a minority stake of the subsidiary to the general public in a stock offering. *See* 12 U.S.C. § 1467a(o)(8)(B); 12 C.F.R. § 575.8(a)(2). In so doing, it raises capital while retaining a majority stake in – and hence control of – the subsidiary. In addition to allowing mutual associations to generate outside capital, this MHC structure allows directors, officers, and employees of the mutual association to receive compensation in the form of stock in the subsidiary.

Congress created the Office of Thrift Supervision as an agency in the Department of the Treasury to regulate mutual

associations, including the process by which those associations can convert to the MHC structure. *See* 12 U.S.C. § 1467a(o)(3). OTS regulations set forth the basic charter form for the MHCs (and any mid-tier holding companies) along with their subsidiaries. The regulations also include several "optional" pre-approved charter provisions that MHC subsidiaries may choose to adopt. *See* 12 C.F.R. §§ 575.9(a)-(c), 575.14(c).

OTS rules also govern the process by which MHC subsidiaries may create stock benefit plans for the benefit of their directors, officers, and employees. *See generally id.* §§ 563b.500, 575.8. To prevent management's self-dealing, OTS has required that those benefit plans be approved by a majority vote of the *minority* shareholders in the MHC subsidiary. *Id.* § 575.8(c). In recent years, however, OTS has become concerned that minority shareholders (including Joseph Stilwell, the petitioner in this case) may be using their leverage in voting on those plans to take advantage of the results of the stock offering – for example, by demanding that management repurchase its stock or sell the institution. *See* OTS Br. at 41-44; Optional Charter Provisions in Mutual Holding Company Structures, 72 Fed. Reg. 35,205, 35,206 (June 27, 2007) (notice of proposed rulemaking).

To address this problem, OTS adopted a new rule following notice to and comment from the interested public. *See* Optional Charter Provisions in Mutual Holding Company Structures, 73 Fed. Reg. 39,216 (July 9, 2008) (final rule). The rule creates an optional provision that MHC subsidiaries may include in their respective charters. Under the optional provision, MHC subsidiaries may prohibit any person or entity from acquiring, or offering to acquire, more than 10% of the MHC subsidiary's total *minority* stock within five years

after the minority stock issuance. 12 C.F.R. §§ 575.9(c), 575.14(c)(3).[*]

Shortly after OTS's adoption of the rule, petitioner Joseph Stilwell and a few affiliated companies filed the present petition for review. Stilwell is a private investor who regularly buys minority stakes in subsidiaries created by mutual holding companies. During the rulemaking process, Stilwell opposed the proposed rule on the grounds that it

---

[*] The full text of the optional provision for MHC subsidiaries reads as follows:

Beneficial Ownership Limitation. No person may directly or indirectly offer to acquire or acquire the beneficial ownership of more than 10 percent of the outstanding stock of any class of voting stock of the association held by persons other than the association's mutual holding company. This limitation expires on [insert date within five years of minority stock issuance] and does not apply to a transaction in which an underwriter purchases stock in connection with a public offering, or the purchase of stock by an employee stock ownership plan or other tax-qualified employee stock benefit plan that is exempt from the approval requirements under § 574.3(c)(1)(vii) of the Office's regulations.

In the event a person acquires stock in violation of this section, all stock beneficially owned by such person in excess of 10 percent of the stock held by stockholders other than the mutual holding company shall be considered "excess shares" and shall not be counted as stock entitled to vote and shall not be voted by any person or counted as voting stock in connection with any matters submitted to the stockholders for a vote.

12 C.F.R. § 575.9(c). The optional charter provision available to subsidiaries of mid-tier MHCs is virtually identical. *Id.* § 575.14(c)(3).

would inappropriately favor the interests of MHC management, disenfranchise minority shareholders, and undermine sound corporate governance. Letter from Spencer L. Schneider, Counsel to Stilwell, to OTS Chief Counsel (Aug. 24, 2007); Letter from Spencer L. Schneider, Counsel to Stilwell, to OTS Chief Counsel (Nov. 20, 2007). He makes substantially the same claims in his petition for review to this Court, and he argues that the rule is arbitrary and capricious under the APA.

## II

Before proceeding to Stilwell's challenge to the rule on its merits, we first consider whether his claim is justiciable. OTS argues that Stilwell lacks standing because the rule has not caused him an injury; it also contends that Stilwell's petition is not ripe. We disagree on both counts.

## A

To demonstrate standing under Article III of the Constitution, Stilwell must show an injury in fact caused by the defendant and redressable by judicial relief. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Pub. Citizen v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1289 (D.C. Cir. 2007). The regulation at issue here directly regulates mutual holding company (MHC) subsidiaries, not investors. As an investor, Stilwell therefore has a more difficult burden to demonstrate standing; he has to show a "substantial probability" of injury as a result of the rule. *St. John's United Church of Christ v. FAA*, 520 F.3d 460, 462 (D.C. Cir. 2008) (internal quotation marks omitted).

In light of Stilwell's past practice and future investment plans, he has demonstrated such a substantial probability.

There is plainly a high – indeed, a near-certain – probability that at least some MHC subsidiaries selling minority stock to the public will adopt the optional provision limiting the size of any individual's minority stake. OTS proposed and ultimately adopted this new approach for this precise reason: to help solve the perceived problems posed by activists like Stilwell investing in MHC subsidiaries. *See generally* Optional Charter Provisions in Mutual Holding Company Structures, 72 Fed. Reg. 35,205, 35,206 (June 27, 2007) (notice of proposed rulemaking); OTS Br. at 44. Comments on the rule – including from representatives of prominent bankers' trade associations – supported the rule on the same grounds. *See, e.g.*, Letter from Patricia A. Milon, Chief Legal Officer, America's Cmty. Bankers, to OTS Chief Counsel (Aug. 27, 2007); Letter from Christopher M. Paridon, Counsel to Am. Bankers Ass'n, to OTS Chief Counsel (Aug. 27, 2007); Letter from Christopher Cole, Regulatory Counsel, Independent Cmty. Bankers of Am., to OTS Chief Counsel (Aug. 27, 2007). Indeed, amicus curiae American Bankers Association notes that "the outcome of this case will have a very real impact upon the ability of mutual associations to defend themselves." American Bankers Ass'n Br. at 3. There is no doubt, moreover, that a MHC subsidiary's adoption of the optional charter provision will harm Stilwell's economic interests: He has previously obtained, and wants to continue to obtain, more than 10% of the minority stock of certain MHC subsidiaries. We agree with Stilwell, therefore, that "it is more than a little ironic that OTS would suggest Petitioners lack standing and then, later in the same brief, label Petitioner Stilwell as a prime example [of] one of the activist MHC shareholders who supposedly have created the very problem the Rule was intended to address." Stilwell Reply Br. at 7.

Under the OTS rule, it is substantially probable that MHC subsidiaries will adopt charter provisions that will cause

Stilwell economic harm; he therefore has standing to challenge the rule as a violation of the APA. *See Clinton v. City of New York*, 524 U.S. 417, 432-33 (1998) (finding standing based on probable economic injury caused by government action changing market conditions); *St. John's*, 520 F.3d at 462 ("substantial probability" of injury needed for injury-in-fact); *Sabre, Inc. v. Dep't of Transp.*, 429 F.3d 1113, 1119 (D.C. Cir. 2005) (finding standing where it was "reasonably certain that [petitioner's] business decisions will be affected"). Put more generally, when an agency adopts a rule with the purpose and substantially probable effect of economically helping regulated Party A and hindering Party B, Party B ordinarily will have standing to challenge the rule. So it is here.

## B

Stilwell's challenge is also ripe. The OTS rule is concededly a final rule, and there is a substantial probability that MHC subsidiaries will adopt the optional charter provision it makes available. This, in turn, will harm Stilwell's investment prospects. Because Stilwell is challenging the validity of the OTS rule itself – and not the charter provision's subsequent adoption by any particular mutual association – there is no persuasive reason to postpone consideration of his challenge. *See Sabre*, 429 F.3d at 1119-21. For ripeness purposes, this case is no different from the myriad cases in which we entertain challenges to an agency's final rule. We therefore turn to the merits.

## III

On the merits, Stilwell advances two main reasons that the OTS rule is arbitrary and capricious under the APA. Stilwell does not argue that the rule violates any particular

statutory provision. Therefore, this is a *State Farm* case, not a *Chevron* case. *See Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29 (1983); *Chevron USA, Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984). Under *State Farm*, we must uphold OTS's rule so long as it is reasonable and reasonably explained. *See State Farm*, 463 U.S. at 43. Applying this deferential standard, we reject Stilwell's arguments.

*First*, Stilwell contends that OTS failed to present any substantial empirical evidence justifying the new regulation. In essence, Stilwell claims that the new regulation is a solution in search of a problem. Although Stilwell has made a forceful submission, this claim is ultimately resolved by the deferential nature of arbitrary and capricious review of agency rules. *See Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974). The APA imposes no general obligation on agencies to produce empirical evidence. Rather, an agency has to justify its rule with a reasoned explanation. Moreover, agencies can, of course, adopt prophylactic rules to prevent potential problems before they arise. An agency need not suffer the flood before building the levee.

Here, OTS thoroughly explained its concern that minority shareholders could use and were using their leverage to "take unfair advantage" of the proceeds resulting from the stock offering. *See* Optional Charter Provisions in Mutual Holding Company Structures, 72 Fed. Reg. 35,205, 35,206 (June 27, 2007) (notice of proposed rulemaking). OTS based its proposed rule on its long experience of supervising mutual savings associations; its view found support in various comments submitted in response to the proposed rule. Optional Charter Provisions in Mutual Holding Company Structures, 73 Fed. Reg. 39,216, 39,217 (July 9, 2008) (final rule). We see no basis, at least under the deferential arbitrary

and capricious test, for overruling OTS's considered judgment of the need for this regulation. *See Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 300 (D.C. Cir. 2003).

*Second*, Stilwell argues that the new rule will exacerbate the problem of allowing management to give itself generous stock plans. Stilwell argues, in particular, that the new rule makes it too difficult for minority shareholders to prevent the majority from doing so. Although Stilwell is correct that the rule will make it harder for some minority shareholders to prevent MHC subsidiaries from adopting stock compensation plans, that alone does not establish that the rule is arbitrary and capricious. As OTS explained, the optional charter provision does not affect the separate OTS regulation – readopted shortly before this rule – requiring that a majority of minority shareholders approve stock benefit plans. *See* Optional Charter Provisions, 73 Fed. Reg. at 39,218-19; 12 C.F.R. § 575.8(c). Because that voting requirement remains in place, minority shareholders as a class continue to have the power to vote down stock benefit plans.

Perhaps more to the point, OTS has discretion under this statutory scheme to balance the power of majority and minority shareholders in order to achieve its multiple regulatory objectives. Those objectives include *both* preventing majority shareholders from granting themselves overly generous stock packages *and* preventing minority shareholders from taking advantage of their veto power over such packages, to the harm of the institution. One can certainly quibble with the balance struck by OTS. But we find no basis under the arbitrary and capricious test for overturning its assessment.

Relatedly, Stilwell claims that the rule eliminates the right of minority shareholders to solicit proxies in excess of

10% of the minority shares, thereby unduly weakening them. But the premise of this argument is inaccurate. As OTS explained in the preamble to the rule, the treatment of such proxies as "beneficial ownership" for the purposes of the 10% limit is by no means automatic. Rather, the treatment depends on whether the proxies are held in circumstances that "give rise to a . . . control determination" under OTS's separate control regulations. Optional Charter Provisions, 73 Fed. Reg. at 39,219; *see also* 12 C.F.R. §§ 574.4(a)-(b). In the absence of such a control determination, a minority shareholder therefore would typically be able to solicit and vote proxies in excess of 10% of the minority shares without violating the rule. OTS Br. at 53. In short, OTS's approach to this issue does not rise to the level of arbitrary and capricious behavior for the purposes of the APA.

\* \* \*

We deny the petition for review.

*So ordered.*